1808.

Howard
vs
Moale

---

### HOWARD *vs.* MOALE, *et al.* Lessee.

JUNE.

APPEAL from the General Court. The appellee, on the 5th of May 1801, instituted his action of *ejectment* for a

The death of one of the lessors of the plaintiff, in an action of ejectment, may be suggested after the jury are sworn, and his heir, &c. need not appear, or be made a party

On the question, whether or not a grant of land from the proprietary to "R M, and the heirs of his body lawfully begotten, for ever," created an estate tail in R M, and upon his death without issue, the reversion was in this state standing in the place of the proprietary, notwithstanding R M's deed barring the estate tail. *Held*, that no interest in the nature of a trust estate ever was vested either in the proprietary, or in the state in the place of the proprietary, no act having been done which could create a trust in either; and that they could only be considered as parties having a reversionary interest expectant on the determination of the estate tail

The *jura regalia*, as attached to the person of the king in *England*, never did attach to the lord proprietary of *Maryland*

The proprietary held the dominion of *Maryland*, and property of the soil, which he could sell and dispose of in the same manner as any other person, and subject to the same beneficiary, legal and equitable rights, as in the hands of any other person

On an equitable interest being obtained in land agreeably to the rules of the land office, the party became entitled to a grant which he could compel of the proprietary

1808.          tract of land called *David's Fancy*, situate in *Baltimore*
~~~~~~         county, into *forty-eight* separate parts, to be divided, nine
Howard         parts of which were demised by *John Moale*, nine parts by
vs
Moale

The reversionary interest of the proprietary, reserved in lands granted by him, might be destroyed by deed made by the tenant in tail, under the act of June 1773, *ch.* 1, as effectually as the reversionary right of any individual

The state held the proprietary's reversionary interest merely by substitution in his place, and a deed since the act of November 1782 *ch* 23, was competent to bar and extinguish the reversionary interest of the state

A grant for escheat land will relate back to the original grant

A subsequent grant, covering land in which the proprietary had a reversionary interest, will operate to pass such reversionary interest

A grant of land surveyed under a common warrant, will not pass land not then liable to escheat, but which afterwards became escheat, and as such granted to a third person. *(Note)*

An escheat certificate and grant do, by operation of law, relate to the original tract, and is strictly within the principle and rule of law of relation between grants and certificates

Where the first and second courses of an original grant of a tract of land called D F, are described as "beginning at a bounded locust tree, being the N E bounded tree of D P's land, [called U C,] and running by the land of the said P, E 65 ps. to a bounded oak, then N E 150 ps. to a bounded red oak of the said P's land; and the first and second courses of an escheat grant of the same land called D F, is described as "beginning at a locust now bounded at or very near to the place where stood a bounded locust, the original beginning tree of D F, and a bounded tree of a tract of land called U C, formerly laid out for D P, and running thence with the said land E 65 ps. (it being expressed in the certificate of the original survey to run by the land of the said P, £ 65 ps. to a bounded oak, which cannot be found,) thence N E 238 ps still bounding on the said land, to the N W branch of *Patapsco* river, (it being therein expressed to run N E 150 ps. to a bounded red oak of the said P's land, and the certificate of the said P's land mentioning to run that course to a bounded red oak standing by the side of the said N W branch, which oak is not known.") *Held*, that there was no doubt or ambiguity, and that if the beginning of D F is rightly located on the plots at the termination of the twelfth line of U C, and there is no evidence of the existence of any tree as called for at the termination of the first line of U F, then the expressions in the escheat grant do bind that grant to the true location of the original tract called D F, as to the two first lines thereof, so far as the second line of the original did actually extend; and that the first and second lines of the original tract do, by virtue of the expressions therein used, bind those lines on the thirteenth and fourteenth lines of U C

Where the plaintiff has not located his escheat grant on the plots in the cause co-extensive with the location of the original tract; he cannot give evidence to extend his pretensions beyond the lines and limits he has given to the escheat grant; but he is estopped by that location from going beyond the letter V, located on the plots, from whence he must run to the head of *Howard's* Branch, at whatsoever point the same may be agreeably to his location of his pretensions, and the location by which the defendant has taken defence

The plaintiff cannot give any evidence of the lines of his escheat grant, running otherwise than he has located them on the plots in the cause as his pretensions; but he is not precluded from giving evidence of any other lines, as the lines of the original tract, by way of illustration; and he may support the location of his pretensions, so far as he can show that they are located within the limits of the original tract

From the place where the second line of a tract of land terminated, the third line thereof, viz. "Then N N W 86 ps to a bounded red oak, then," &c. must run the number of perches expressed in the grant, and cannot in its length be increased or diminished, unless proof is made of the tree called for, or the place where it stood

So the fourth line, viz. "Then S W to the head of *Howard's* Branch, then," &c. must run a straight line to the head of *Howard's* Branch

A private plot of the lands in dispute, permitted, under certain circumstances, to be read in evidence

The course and distance expressed in a grant of land, must always be controled by a call expressed therein as the termination of the course; and the following course and distance used in the grant, viz. "N E 50 ps. to a small branch which maketh the outward narrows of the said land," must be complied with, as nearly as they can, to strike the branch described, as it existed at the time of the survey, subject to the variation of the compass on that line

The court refused to direct the jury, that the second line of a tract of land, viz. "Then N E 150 ps. to a bounded red oak of the said P's land," (being the fourteenth line of that land, which tree being lost, the place where it stood could not be proved,) must terminate at the end of 150 ps from the beginning thereof, it being a matter of fact to be left to the determination of the jury

The court refused to direct the jury, that an escheat grant did not pass any land included in the original grant, except the same was included within the metes and bounds of the escheat grant, as particularly described; and that the escheat grant did not, by legal operation, convey all the land included within the original grant, unless the particular metes and bounds of the escheat grant did also include the same

A deposition taken on the survey of a witness, who was absent out of the state at the time of the trial, was permitted to be read in evidence, due diligence having been used to obtain the attendance of the witness

The court directed the jury, that they might find the true location of D F, for which the ejectment was brought, by a greater or less variation of the compass, as might appear to them proper from the evidence; provided that by such allowance of variation they did not enlarge or extend the plaintiff's pretensions beyond the location of his pretensions made on the plots, or beyond a straight line to be drawn from the letter V to the head of *Howard's* Branch

The court directed the jury, that the plaintiff could not recover any land which should be found to lie without and beyond a straight line to be drawn from the letter V, to the head of *Howard's* Branch, (he having located that line of his grant in that manner,) although those lands should lie within the lines of the tract of land for which the ejectment is brought, and also within the lines of the plaintiff's pretensions, as located on the plots

The court refused to direct the jury, that if the plaintiff is estopped from showing the true location of the land, for which the ejectment is brought, different from what is located by him for his pretensions, so as to prevent him from recovering what is contained in his pretensions within the true loca-

Richard H. Moale, nine parts by Robert North Moale, nine parts by Samuel Moale, nine parts by Randle Hulse Moale, one part by Thomas Moale, one part by Richard Curson, Junior, and one other part by Rebecca Russell. The defendant, (now appellant,) pleaded not guilty, and took defence on the plots made and returned in the cause.

The plaintiff, at the trial court, in May 1804, made his claim and pretensions for a tract of land called David's Fancy, resurveyed for John Moale, on the 1st day of November 1738, as the same is located by him, the plaintiff, upon the plots returned in the cause, as per table of courses No. 2, viz. From the letter A, (1) N. 86¾, E. 65 perches, (2) N. 41¾, E. 235 perches to b, (3) N. 25¾, W. 86 perches to V, (4) N. 86, W. 112½ perches to F, (5) S. 51, W. 14, (6) S. 24, W. 5, (7) S. 67, W. 12, (8) S. 10½ W. 40, (9) S. 70, W. 4, (10) S. 47, W. 6, (11) S. 36½, W. 16, (12) S. 54, W. 21, (13) S. 75, W. 8, (14) S. 18½ W. 14, (15) S. 71, W. 14, (16) S. 35, W. 14, (17) S. 89, W. 10, (18) S. 28, W. 14, (19) S. 8, W. 18, (20) S. 10½, E. 18, (21) S. 65, E. 18, (22) S. 14¾, E. 38, (23) S. 40½, E. 23, (24) S. 7, W. 31, (25) thence to the beginning, containing 257 acres. The defendant took defence for all that part of Lun's Lot, granted to Edward Lun on the 20th of July 1673, beginning at red A on the plots, and running with the black drawn lines, red figures 1, 2, 3, 4, 5, 6, 7, 8, 9, then with the blue shaded line to P, then with the black drawn line to 4, then with the red broken dotted line to V, then to red 1, then with the black lines, black figures 19, 20, red figures 14, 15, 16, 17, 18, 19, and then to red A, as per table of courses No. 26. Judgment was entered against the casual ejector for the land called David's Fancy, undefended on the plots by the defendant. After the jury were sworn by the issue, the plaintiff, by his attorneys, suggested, that since the demises in the declaration, and the institution of this suit, and before then, &c. to wit, on, &c. Richard H. Moale, one of the lessors in the declara-

tion, the defendant is also estopped from saying that the true location is different from the location given by the plaintiff

The jury, by their verdict, in an action of ejectment, having found the true location of the land, for which the ejectment was brought, to be from A to a, to 3, to four perches below big F, the head of Howard's Branch, and then to A; they also found for the plaintiff his pretensions, (not being to the extent of the said location,) to be from A to a, to V, to four perches below big F, the head of Howard's Branch, and then to A, and that the defendant was guilty of the trespass complained of within the said pretensions, and not guilty as to the residue of the trespass complained of in the residue of the land. Held, that there was no uncertainty in the verdict

A mortgage of lands to a British subject before the revolution, was not thereafter defeated by the act of confiscation, but it was protected by the British treaty, and the mortgage property was decreed to be sold to pay the mortgage debt. (Notes.)

tion mentioned, who demised nine parts of the premises, (in forty-eight parts to be divided,) to the plaintiff, had died, and which was not denied.

1. *The first bill of exceptions.* The plaintiff, to make title to the tract called *David's Fancy,* read in evidence a certificate of survey of *David's Fancy* made for *David Williams* on the 22d of June 1671, and containing 100 acres, which certificate recites, that by virtue of a warrant granted unto *Robert Wilson* for 650 acres, bearing date the 17th of June 1671, 100 acres thereof was assigned unto *David Williams,* by *Wilson,* there was, therefore, laid out for *Williams* "a parcel of land called *David's Fancy,* lying in *Baltimore* county, on the N. side of *Patapsco* river, and on a branch called the Middle Branch, beginning at a bounded locust tree, being the N. E. bounded tree of *David Poole's* land *(a),* and running by the land of the said *Poole* E. 65 perches, to a bounded oak, then N. E. 150 perches to a bounded red oak of the said *Poole's* land, then N. N. W. 86 perches to a bounded red oak, then S. W. to the head of *Howard's* Branch, then bounding on the said branch, and the said Middle Branch, to the first bounded tree, containing and laid out for 100 acres more or less." The plaintiff also offered in evidence a patent for the land called *David's Fancy,* granted to *Williams* on the 1st of May 1672. The courses, &c. in the patent corresponding with those in the certificate, except in the patent the *S. W.* course, last above mentioned, is described to run "S. W. and by W. to the head of *Howard's* Branch," &c. He also offered evidence, that *Williams* departed this life, intestate, and without heirs. He also produced and read to the jury, a warrant of escheat issued to *John Moale,* setting forth that there was escheat to the Lord Proprietary, a tract of land called *David's Fancy,* lying in *Baltimore* county, on the W. side of the Middle Branch, originally granted on the 1st of May 1672, to *David Williams,* for 100 acres. That on the 13th of March 1722, a certain *Thomas Cromwell,* by his petition, setting forth that he was seized in fee thereof, obtained a special warrant to resurvey it, and a certificate thereof was returned, by which it appeared that there were 83 acres of surplus land included, for which *Cromwell* never compounded nor sued out grant of confirmation thereon, contrary to sundry

*(a)* Called "Upton Court."

of his Lordship's proclamations for that purpose published. That apprehending his Lordship's rights had not been complied with, *Moale*, on the 14th of April 1737, obtained a special warrant to resurvey the said tract, in order to have the benefit of the surplus, and the contiguous vacancy, if any. That since, upon the strict search made both in the records of the provincial court and county court of the county where the land lay, as also in the records of the commissary's office, he could not find any conveyance from *Williams* to one *John Athrine*, who had pretended a right to the land, nor to any other person, nor that ever he willed the same to any person whatsoever; by which means, *Moale* was advised that the land had become escheat to his Lordship; and he, being the first discoverer, and desirous to purchase his Lordship's right thereof, be it escheat by the means aforesaid, or by any other ways or means whatsoever, prayed a special warrant to resurvey the same, &c. which was granted, &c. and the surveyor was directed carefully to resurvey, for and in the name of *Moale*, the tract of escheat land called *David's Fancy*, according to its ancient metes and bounds, with its surplusage, and by his outlines adding what vacant land he could find to the same contiguous, whether cultivated or otherwise, not running his lines, &c. He also offered evidence, that the warrant, not having been executed in time, was, on the 17th of May 1738, renewed for six months longer. That in virtue of the last mentioned warrant, a certificate of survey was returned, dated the 1st of November 1738, by which it appears, that there was resurveyed for and in the name of *Moale*, the tract of land called *David's Fancy*, with its surplusage, according to the ancient metes and bounds thereof, as shown to the surveyor, lying in the county aforesaid, on the E. side of the middle branch of *Patapsco* river, beginning at a locust now bounded at or very near to the place where stood a bounded locust, the original beginning tree of *David's Fancy*, and a bounded tree of a tract of land called *Upton Court*, formerly laid out for *David Poole*, and running thence, with the said land, E. 65 perches, (it being expressed in the certificate of the original survey to run by the land of the said *Poole*, E. 65 perches to a bounded oak, which cannot be found,) thence N. E. 238 perches, still bounding on the said land to the N. W. branch of *Patapsco* river, it being therein express-

1808.

Howard
vs
Moale.

ed, to run N. E. 150 perches to a bounded red oak of the said *Poole's* land, and the certificate of the said *Poole's* land mentioning to run that course to a bounded red oak, standing by the side of the said N. W. branch, which oak is not known, thence N. N. W. 86 perches, S. 83° 30' W. 133 perches, to the head of *Howard's* Branch, it being expressed to run S. W. to the head of *Howard's* Branch, thence bounding on the said branch, and the aforesaid Middle Branch, to the first bounded tree, as mentioned in the certificate of the original survey, as follows, viz. S. by W. 16 ps. S. 41, E. 16 ps. N. 83, W. 24 ps. S. W. 40 ps. N. 73, W. 10 ps. S. 22, W. 24 ps. W. 9 ps. S. 30, W. 12 ps. N. 74, W. 10 ps. still bounding on *Howard's* Branch to the Middle Branch, thence S. 38, W. 16 ps. S. 11, W. 15 ps. S. 2, E. 12 ps. S. 12, E. 12 ps. S. 70, E. 12 ps. S. 12, E. 38 ps. S. 37, E. 28 ps. still bounding on the Middle Branch, and thence by a straight line, bounding on the branch, to the beginning, containing and laid out for 257 acres more or less, to be held," &c. "by the name of *David's Fancy*." He also read in evidence the grant issued thereon to *Richard Moale*, dated the 29th of September 1750, which grant recites, that *Charles Croxall*, (guardian and next friend to *Richard Moale*, an infant, under the age of twenty-one years,) did set forth, that a certain *John Moale*, deceased, father to *Richard*, did heretofore set forth that there was escheat, &c. (as in the recital in the special warrant granted to *John Moale*,) that a warrant issued, was renewed, and a resurvey made, and certificate thereof returned, by which it appeared, &c. That before *John Moale* obtained a grant of confirmation for the same, he died, but before his death he made his last will and testament, in which was the following bequest: "Item. I give and bequeath unto my infant son, to be christened by the name of *Richard*, all that tract of land I bought of *Jacob Giles*, named *Upton Court*, and also the land adjoining thereto, which I escheated and paid his Lordship's agent for, as per the receipt on the back of the certificate now in the office, the patent not yet being issued out, to him my said beloved infant son, and his heirs lawfully begotten, from him and their bodies, for evermore; but if either of my aforesaid sons should die without such heirs aforesaid, then it is my will, that the land which I have herein devised the dead son, heir less, shall go to the living son, to be held of him, and his lawful heirs, from ge-

heration to generation as aforesaid." *Croxall*, therefore, prayed, that for as much as the right of the escheat land was in *Richard Moale*, and all requisites complied with, grant of confirmation might issue to him on the certificate, agreeably to the bequest aforesaid, &c. Therefore, in consideration thereof, and other the premises, &c. the " Lord proprietary did give, grant and confirm, unto him, " the said *Richard Moale*, and the heirs of his body lawful- " ly begotten, for ever, agreeably to the bequest aforesaid, " all that the aforesaid tract or parcel of escheat land re- " surveyed, and still called *David's Fancy* lying," &c. as described in the certificate herein before mentioned—"To " have and hold the same unto him the said *Richard Moale*, " and the heirs of his body lawfully begotten, for ever; to be " holden, of" &c. He also read in evidence the last will and testament of *John Moale*, for whom the certificate of survey was made and returned, dated the 14th of January 1739-40. Whereby he devised to his son *John*, to him and his heirs law-fully begotten from his and their bodies, for ever more, sundry parcels of land; and he also devised to his infant son, to be christened by the name of *Richard*, the lands mentioned in, and in the manner set forth in the grant last before mentioned. He also read in evidence a deed of indenture dated the 11th of April 1783, from *Richard Moale* to *James Croxall*, reciting that *Moale* was seized of an es-tate, in fee tail, in and of a tract of land called *David's Fancy*, (saving and excepting that part thereof before con-veyed by him to *Mary Tribolet*,) lying, &c. and it was the intent, meaning and design of *Moale*, according to the act of assembly, &c. fully and effectually to bar, dock and de-stroy the entail, and to grant, convey and transfer to *Crox-all*, and his heirs, absolutely and fully, the said tract of land, (saving and excepting as aforesaid,) with the appurtenances thereunto belonging, in order, and with the intent, and for the purpose, that *Croxall*, on his becoming thereby seized thereof in fee simple, might reconvey and assure unto *Moale*, and his heirs, the tract of land, &c. in consequence and on the operation whereof, *Moale* might be and stand seized of, and be entitled unto, the premises, fully and absolutely, in fee simple. The indenture, therefore, wit-nessed, that *Moale*, in consideration of the premises, and also for and in consideration of the sum of five shillings, &c. granted, &c. unto *Croxall*, the tract of land, (saving

1808.

Howard
vs
Moale

1808.

Howard
vs.
Moale.

and excepting as aforesaid,) in the usual form. He also read in evidence a deed of indenture, dated the 12th of April 1783, from *James Croxall* to *Richard Moale*, for the tract called *David's Fancy*, excepting that part sold by *Moale* to *Mary Tribolet(a)*. He also offered in evidence, that *Richard Moale* died sometime in the year 1786, without issue of his body lawfully begotten, having first duly made and executed his last will and testament in writing, dated the 22d of February 1786, whereby he devised all that part of the tract of land called *David's Fancy*, for which this suit is brought, to his brother *John Moale*, in fee simple. That *John Moale*, the devisor first named, left, at the time of his death, two sons, to wit, *John Moale*, his eldest son and heir at law, and *Richard Moale*, the patentee before named. That *John Moale*, the devisee last named, died in the year 1797, having first duly made his last will and testament, dated the 20th of July 1797, whereby he devised all that part of *David's Fancy*, for which this suit is brought, to his sons *John Moale*, *Richard Moale*, *Robert North Moale*, *Samuel Moale*, *George Washington Moale*, and *Randle Hulse Moale*, their heirs and assigns, to be equally divided between them, share and share alike, as tenants in common. He also gave in evidence, that *George Washington Moale*, the devisee mentioned in the last mentioned will of *John Moale* the younger, died after his father *John Moale*, in the year 1797, intestate, unmarried, and without a child. That the lessors of the plaintiff, to wit, *John Moale*, *Richard H. Moale*, *Robert North Moale*, *Samuel Moale*, *Randle Hulse Moale*, *Thomas Moale*, *Rebecca Russell*, and *Elizabeth*, wife to *Richard Curson*, in the declaration mentioned, are the children and the only children, of *John Moale*, the last named devisor; that *Richard Moale*, one of the lessors of the plaintiff, died since the bringing of this suit, and during the pendency thereof, leaving issue now in full life. He also offered evidence, that the true location of the land called *David's Fancy*, granted to *David Williams* in 1672, is, as he hath located the same upon the plots returned in this

(a) The defendant's attorneys, at this stage of the trial, made their objections to the grant to *Richard Moale*; but as the bill of exceptions contained the whole evidence of title adduced by the parties, we have adopted the mode pursued in the bill of exceptions.

cause; and also that the true location of the land called *David's Fancy*, granted to *Richard Moale* in 1750, for the recovery of which this suit is brought, is the same as that of *David's Fancy*, the original, granted to *David Williams* in 1672, as located by the plaintiff on the said plots. The defendant then read in evidence the certificate of survey, dated the 10th of October 1672, and grant of *Lun's Lott*, to *Edward Lun*, bearing date on the 20th of July 1673, whereby it appears that there was surveyed "a parcel of land lying in *Baltimore* county, on the N side of *Patapsco* river, and on a branch called the N W Branch, called *Lun's Lott*, beginning at a bounded hickory standing on the W side of the falls of the N W branch, and in the line of the land of *Thomas Perte* and *Robert Benjor*, called *Salisbury Plaine*, and running with the line of the said land N W and by N 38 ps. to a bounded hickory in the line of the said land, then S W 165 ps. to a bounded red oak, then S 40 ps. then W N W 45 ps. to a bounded hickory by the head of a branch, then S 125 ps. to a bounded red oak, then W and by S 20 ps. then S and by E 40 ps. then S E 80 ps. to a bounded Spanish oak, then S 60 ps. to a bounded white oak in the land of *John Howard*, called *Timber Neck*, then by the said land E S E 74 ps. to a bounded white oak of the said *Howard's* land, then S E 120 ps. to a bounded red oak standing in a bite of the N W branch, then bounding on the said branch lying up N 50 ps. to a bounded red oak, then N N W 38 ps. then W N W 100 ps. then N and by W 50 ps. to a locust marked with four notches, then N N E 45 ps. to a bounded red oak in the line of the land of *Thomas Cole*, then W 75 ps. to a bounded oak of the said *Cole's* land, then by the said land N N E 275 ps. to another bounded oak, then E 65 ps. to the falls, then bounding on the said falls to the first bounded tree, containing 200 acres, more or less," &c. He also read in evidence the certificate of survey, dated the 8th of April 1762, and grant of *Lun's Lott Enlarged*, dated the 25th of March 1763, surveyed for and granted to *Cornelius Howard*, and *Ruth* his wife, and containing 414 acres, more or less, being in virtue of a special warrant to resurvey a tract of land called *Lun's Lott*; and also proved, that *Lun's Lott* and *Lun's Lott Enlarged*, are truly located on the plots returned in this cause. He also offered evidence to prove, that he is heir at law to *Edward*

*1808.*

Howard
vs
Moale

*Lun,* the patentee of *Lun's Lott,* and also the heir at law of *Cornelius Howard,* and *Ruth* his wife, the patentees of *Lun's Lott Enlarged.* The defendant then prayed the opinion of the court, and their direction to the jury, that the plaintiff, upon the above statement of facts, hath not made title to the lands for which the defendant hath taken defence in this cause, nor any part thereof, and cannot recover in this action.

*Ridgely,* for the Defendant, contended, that the grant to *Richard Moale* of the 29th of September 1750, for *David's Fancy,* vested in him an *estate tail,* and that upon his death, without issue, the reversion is in the state of *Maryland,* standing in the place of the proprietary; and that the deed from *Moale* to *Croxall* had not the effect to bar the estate tail. He cited the act of assembly of *Nov.* 1782, *ch.* 23. *Pigott,* 85, 87, 88, 89. *Neal vs. Wilding,* 1 *Wils.* 275. *Pool vs. Nedham, Yelv,* 149. *Anon. Noy,* 132. 18 *Vin. Abr.* tit. *Common Recovery,* 233, *pl.* 9. 5 *Bac. Abr.* tit. *Prerogative, (E. 5.)*

*Shaaff,* on the same side, cited the *act of assembly* of *October* 1780, *ch.* 45. *Owings vs Norwood's Lessee, (ante* 96.) *Allen vs. Stewart and Patten,* (a). *Laws*

(a) In the case of *Allen vs. Stewart* and *Patten,* in the court of chancery, at May term 1799, the bill was filed on the 29th of August 1798, and it was admitted, that the land mentioned in the bill was mortgaged to *Allen* by *Patten* on the 20th of May 1771, to secure the payment of £142 0 6 sterling money, with interest thereon on the 20th of May 1773. It was admitted that *Allen* was a subject of the King of *Great Britain,* residing in *Maryland* in 1775, and went to *England* in that year, and had resided there ever since. It was submitted to the chancellor to determine, from what time and for how long the mortgagee was entitled to recover interest on the mortgage debt.

HANSON, Chancellor. It appears, that under the circumstances of this case, the chancellor is under no necessity of deciding, or submitting to the general court, the question, as the complainant is a *British* subject, whether or not the interest of the complainant, in the mortgaged property mentioned in the bill, was defeated by the revolution in *America,* and the confiscation act of this state; and that the complainant is entitled to have his debt paid by the defendant, or discharged from a sale of the property. *Decreed,* that unless the mortgaged debt, with interest thereon (except from the 4th of July 1776 to the 3d of September 1783,) until paid, shall be paid on the 9th of November next, the property in the bill mentioned shall be sold, &c.

*Kilty* and *Shaaff,* for the Complainant.
*Moale,* for the Defendants.

23. The Attorney General, (a). Kelly's Lessee vs. Green-field, 2 Harr. & M'Hen. 121. Russell's Lessee vs. Baker, 1 Harr. & Johns. 71. Gitting's jun. Lessee vs. Hall (ante 112.) 5 Bac. Abr. tit. Prerogative, (E. 3.) Com. Dig. tit. Estates, (B. 31.) Statutes 34 Hen. VIII, ch. 20. Acts of assembly of November 1787, ch. 9, and 1785, ch. 87. The State vs. Stump, et al. 2 Harr. & M'Hen. 174. Laidler vs. Young's Lessee, (ante 69.)

Martin, (Attorney General,) Key, and W. Dorsey, for the Plaintiff, cited Calvert's Lessee vs. Eden, et al. 2 Harr. & M'Hen. 279. Act of assembly of Nov. 1782, ch. 23. Doe vs. Pegge, 1 T. R. 758, (note). Armstrong vs. Peirse, et al. 3 Burr. 1900. Goodtitle vs. Jones, 7 T. R. 46, per Ashhurst, J. Doe vs. Wharton & Dixon, 8 T. R. 2. Gilb. on Uses & Trusts, 83, 85, 86. 5 Bac. Abr. tit. Prerogative, (E. 3). Owings vs. Norwood's Lessee, (ante 96.)

Harper, in reply, cited Hall vs. Gitting's Lessee (June 1809). Kelly's Lessee vs. Greenfield. Russell's Lessee vs. Baker. Gitting's Jun. Lessee vs. Hall, and Owings v Norwood's Lessee.

Done, J. delivered the opinion of the court. (b). The court are of opinion, that no interest of the nature of a trust estate ever was vested, either in the proprietary of Maryland, or in the state of Maryland in place of the proprietary. There does not appear ever to have been any act done which could create a trust in either; and that the proprietary and the state could only be considered as par-ties having a reversionary interest expectant on the deter-mination of an estate tail.

The jura regalia, as attached to the person of the king in England, never did attach to the lord proprietary of Maryland.

(a) The case of Lawson vs. The Attorney General, in the Court of Chancery in 1800, was similar to that of Allen vs. Stewart and Patten. In 1769, one Semple mortgaged lands to Lawson, a British subject, and being nothing more than to secure the pay-ment of a debt, it was protected by the treaty. The attorney gene-ral was made a party, who admitted the legal estate to be in the state, and the land was decreed to be sold for the payment of the mortgaged debt.

(b) Chase, Ch. J. did not sit, his sister being interested in the land in question.

The lord proprietary held the dominion and property of the soil, which he could sell and dispose of in the same manner as any other person, and subject to the same beneficiary legal and equitable rights, as in the hands of any other person; and on an equitable interest being obtained, agreeably to the rules of his land office, by any person taking out a warrant, returning a certificate of survey, and paying the composition money, the party became entitled to a grant which he could compel from the proprietary.

In the present case, suppose the right of the proprietary to have continued in full force until the year 1783, his reversionary interest in the lands in question would have been destroyed by the deed made by *Richard Moale*, the grantee in tail, under the operation of the act of 1782, as effectually as the reversionary right of any citizen of *Maryland*.

The question then occurs, whether the case is materially altered by the proprietary's rights passing into the hands of the state?

On this view of the subject, a doubt might arise, whether the state, being vested with the sovereignty as a body politic, can be affected by any laws in which she is not specially named. But this difficulty, in the opinion of the court, is removed, when we consider the state as standing in the place of the proprietary, in which view, and no other, we think the state can be considered in this case, as having no beneficiary interest in the lands in question, but holding the proprietary's reversionary interest merely by substitution in his place, and for the use and benefit of those who had the right in virtue of the escheat and purchase from the proprietary.

By the last will of *John Moale*, the elder, his interest in the lands passed agreeably to the disposition made by the said will, and the deed, made in 1783, by *Richard Moale*, the devisee, and the patentee of the land, was competent to bar and extinguish the reversionary interest of the state.

As these points have been elaborately and ingeniously argued by the learned counsel concerned, the court have thought proper thus shortly to notice them, and express their ideas relative to them.

But let us suppose that the opinion of the court, so far, is not well founded, every objection to the plaintiff's title, arising from any particular prerogatives or privileges in the

proprietary or the state, which would protect their rights from being affected in the same manner as those of citizens, is, in the opinion of the court, completely removed by the operation of the grant of *Lun's Lot Enlarged.*

The escheat and grant of the proprietary thereon will relate back to the original grant of *David's Fancy*, and there is no ground on which to presume that the escheat fell previously to the grant of *Lun's Lot*, the original, but on the contrary the presumption is strong that it did not occur until nearly about the time of the obtention of the escheat warrant.

By the grant of *Lun's Lot Enlarged*, all the reversionary interest of the proprietary in *David's Fancy*, so far as *Lun's Lot Enlarged* interferes with and includes any part of *David's Fancy*, passes to a citizen, and of course is liable to be operated upon, and barred, in virtue of the act of assembly of 1782, by the deed from *Moale* to *Croxall* in 1783.

For these reasons the court refuse to give the opinion and direction to the jury, which is prayed by the defendant's counsel. The defendant excepted, *(a.)*

2. *The second bill of exceptions.* The plaintiff then read in evidence a certificate of the survey of a tract of land called *Upton Court*, made for *George Yate* on the 12th of March 1667, and a grant thereon issued to *David Poole* on the 2d of August 1668, by which it appears that there was surveyed "a parcel of land called *Upton Court*,

*(a)* *D. Dulany, Esquire's* opinion on the following case stated: A. was seized of a certain tract of land, under a title derived legally from the original grantee. B obtained a *common warrant* of survey, and under this warrant, a survey was made, which included part of the land that had before been granted to A, and B, on the certificate returned by the surveyor, obtained a patent. Afterwards A, who was seized as aforesaid, died without heirs, and without having conveyed, or disposed of his title, in consequence whereof the land, of which A died seized, *became escheat.* Afterwards C obtained a *warrant on the escheat*, and as a part of the land, whereof A died seized, was included in the survey of the grant to B, the *query* is, whether B is entitled to the part so included, or C, who claims under the escheat? I am of opinion that B is not entitled to any part of the land under the common warrant that I e obtained, which he was not entitled to when he obtained thereon a patent, and as at the time when the patent was obtained by B, the title was in A under a prior grant, I am of opinion that B cannot legally claim any title to the part included in the patent to A.

*Daniel Dulany.*

August 13, 1783.

lying in *Baltimore* county, on the N side of *Patapsco* river, opposite the land of *Hugh Kinsey*, beginning at a bounded red oak standing on the southernmost side of a point of land formerly called *Whetstone Point*, and from the said oak bounding on the said river by a line drawn N W and by N 40 perches, then N W and by W 40 perches, and from the end of the N W and by W line by a line drawn W 100 perches, bounded on the W by a line drawn W N W 30 perches, then N W 100 perches, to a small creek, then over the said creek by a line drawn W and by S 30 perches, then W S W 45 perches, then S W 80 perches to the mouth of another small creek, then over the said creek S and by W 45 perches, then *S W and by S 55 perches to a* point which maketh the mouth of a branch called the Middle Branch, then *bounding on the said branch by a line drawn N W and by N* 180 *perches* to a marked oak opposite a small island, and from the said oak *N E 50 perches* to a small branch which maketh the outward narrows of the said land, then *E 65 perches*, bounded on the E by a line drawn *N E* 150 *perches* to a bounded red oak *standing by the N W branch*, then E S E 56 perches, then E N E 120 perches, then E S E 44 perches, then S S E 100 perches to a small cove, then over the said cove by a line drawn S E 100 perches, to a point called The Sandy Point, then S S E 48 perches to another marked oak on Whetstone Point, and from the said oak to the first bounded tree, containing 500 acres of land more or less." He also gave in evidence the plots and locations in this cause, and the admission of the plaintiff and defendant, that the eleventh line of *Upton Court* terminated at the letter black H on the plots. He also gave in evidence, that the twelfth line of *Upton Court* terminated at the black letter A on the plots; and further gave in evidence to the jury that the beginning of *David's Fancy*, the original, was at the letter A; and also that the beginning of *David's Fancy*, the escheat in 1738, was at the letter A. The plaintiff then prayed the opinion of the court, and their direction to the jury, that if they find from the evidence in the cause that the *twelfth line* of *Upton Court* terminated at the letter A, and that the beginning of *David's Fancy*, the original, and *David's Fancy*, the escheat, was at the same place, that then the escheat certificate and pa-

tent of *David's Fancy*, granted to *Richard Moale* in 1750, do by operation of law relate to the original tract called *David's Fancy*, patented in 1672; and that the expressions in the escheat grant contained, do, by operation of law, bind the escheat land to run with the true location of the original tract of *David's Fancy*, as to the *two first lines* thereof, so far as the said lines extend; and that the *first and second lines* of the original *David's Fancy*, do by virtue of the expressions therein used, bind the said lines to run with the *13th and 14th lines* of *Upton Court*.

*Shaaff* and *Harper*, for the Defendant, referred to *Dorsey's Lessee vs. Hammond*, 1 Harr. & Johns. 190. *Darnall's Lessee vs. Goodwin*, 1 Harr. & Johns. 282. *Helm's Lessee vs. Howard*, 2 Harr. & M'Hen. 57. *Hammond's Lessee vs. Norris*, (ante 130;) and *Kyger vs. Kirkpatrick*, 1 Harr. & Johns. 298.

DONE, J. delivered the opinion of the court. Three propositions have been stated by the prayer of the plaintiff's counsel, for the opinion of the court, and their direction to the jury.

1st. That the escheat certificate and patent of *David's Fancy*, granted to *Richard Moale* in 1750, do by operation of law relate to the original tract called *David's Fancy*.

2dly. That the expressions in the said escheat grant contained do, by operation of law, bind the said escheat land to the true location of the original tract called *David's Fancy*, as to the two first lines thereof; and

3dly. That the first and second lines of the original tract called *David's Fancy* do, by virtue of the expressions therein used, bind the said lines on the 13th and 14th lines of *Upton Court*.

On the *first point*, the court are of opinion that the escheat certificate and patent of *David's Fancy* do, by operation of law, relate to the original tract called *David's Fancy*. That this is a case strictly within the principle and rule of law, of relation between grants and certificates, which have been adopted and ratified by solemn decisions of the general court and court of appeals, and that in law, reason or equity, there can be no distinction.

With respect to the *second* and *third points* proposed, it has been contended by the defendant's counsel, that the

court are precluded from acting upon them, by the decision of the court of appeals in the case of *Dorsey's Lessee vs. Hammond*, and that by the rule laid down by that decision, these are to be considered as questions of location, and must be left to the determination of the jury.

This court, let their private opinions be as they may, will always cautiously avoid interfering or clashing with the judicial decisions of the superior court, and will at all times pay respect to them as the established law of the land.

Whether too large a latitude is given to juries as to the construction of grants by the decision of the court of appeals in *Dorsey vs. Hammond*, and how far the rule and principle thereby adopted may operate to preclude uncertainty of decision, is not for us to consider.

The question then arises, whether the court are precluded by that determination from giving their opinion on the question now before them? and we think that we are not so precluded; but that the present question rests on grounds and principles entirely distinct from that case, and *Helms vs. Howard*, which has been cited to the court.

In *Dorsey's Lessee vs. Hammond*, the question was, whether the binding call in one course would be extended to the subsequent courses? the first using imperative binding expressions, which were dropped in those succeeding, then there were distinct courses, either of which might be pursued, and one of which must be rejected; and the court of appeals were of opinion, that this was a description with a double aspect; that it was ambiguous and doubtful, and that therefore it was discretionary which set of courses should be pursued, and ought to be left to the jury as a question of location.

The opinion of the judges in *Helm's vs. Howard* is founded on the same principle. In that case all the expressions could not be gratified; there were two distinct and different courses, one of which must be pursued, and the other rejected. Therefore, the court said, it must be left to the jury as a matter of location, to determine which must be adopted, and which rejected.

In the present case the court are of opinion, that no such doubt or ambiguity appears. Abstractly considered, the expressions are unquestionably binding, and the court of appeals have so far concurred with this court as to say,

that we are competent to determine where expressions are imperatively binding by particular calls.

The court will not interfere with the right of the jury, by assuming any facts, nor will they take upon them to determine what is the true location of the several tracts of land delineated on the plots, or any of them, or the extent or termination of their lines. We will not take upon us to say, whether the tract called *David's Fancy*, as located by the plaintiff, begins at the right point, or whether there is or is not evidence to the jury of the existence of a tree at the termination of the first line of that tract, which would vary the course, or make it longer or shorter than the thirteenth line of *Upton Court*. But the court think, that they are not restricted by the decision in *Dorsey and Hammond*, from giving their opinion hypothetically in the present case, (which they believe to be strictly within the rule established in *Dorsey & Hammond*,) that if the jury should be satisfied from the evidence, that the beginning of *David's Fancy* is rightly located on the plots by the plaintiff, at the termination of the twelfth line of *Upton Court*, and there is no evidence to them of the existence of any tree as called for in the grant at the termination of the first line of *David's Fancy*, which would vary the same from the course or distance of the thirteenth line of *Upton Court*, that then the expressions contained in the escheat grant do, by operation of law, bind the said escheat land to the true location of the original tract called *David's Fancy*, as to the two first lines thereof, so far as the jury shall believe that the second line of *David's Fancy*, the original, did actually extend; and that the first and second lines of the original tract called *David's Fancy* do, by virtue of the expressions therein used, bind the said lines on the thirteenth and fourteenth lines of *Upton Court*. Which opinion and direction the court do accordingly give to the jury. The defendant excepted.

3. The defendant then prayed the opinion of the court, and their direction to the jury, that as the plaintiff hath in this cause located the land called *David's Fancy*, surveyed for *John Moale* on the 1st of November 1738, different from the land called *David's Fancy*, surveyed for *David Williams* on the 22d of June 1671, and hath not on the plots located those lands in the same way, the

plaintiff shall not be permitted to give any evidence to the
jury, that the two tracts of land have the same location;
and that the plaintiff is concluded by the location he hath
given on the plots of the tract of land called *David's Fan-
cy,* surveyed for *John Moale:* He further prayed the opi-
nion of the court, and their direction to the jury, that as
the plaintiff hath in this cause located the two first lines
of *David's Fancy,* surveyed for *John Moale* the 1st of No-
vember 1738, running from the black letter A, then with
the black broken and dotted lines No. 1 and No. 2, to the
black letter b, and hath given no other location thereof on
the plots, the plaintiff is not permitted to give in evidence
any other location of the two first lines of that tract; but
that the plaintiff is precluded from setting up under the
plots in this cause any other location of the two first lines.

*Shaaff* and *Harper,* for the Defendant, contended that
the plaintiff ought not to give proof different from his al-
legations. They cited *Hammond vs. Norris,* (*ante* 130.)

*Martin,* (Attorney General,) and *Key,* for the Plaintiff,
cited *Carroll et al. Lessee vs. Norwood,* 1 *Harr. & Johns.*
167. *Gray et ux. Lessee vs. Amos,* in the General Court
at October term 1796, where the plaintiff located his pre-
tensions three ways, neither of which the jury found, al-
though their finding was in favour of the plaintiff, and in-
cluded more land than he claimed. He took judgment
for the land claimed by him within the finding of the jury,
and entered a release as to the residue. *Darnall's Lessee
vs. Goodwin,* 1 *Harr. & Johns.* 282. *Hicks vs. Scott,* in
the General Court, on the E. S. *Nicholson vs. Hemsley,*
3 *Harr. & M'Hen.* 409, where dotted lines were made on
plots by the jury, without objection. *Kirkpatrick vs. Ky-
ger,* 1 *Harr. & Johns.* 298.

Done, J. delivered the opinion of the court. The court
are of opinion, that as the plaintiff has not located his pre-
tensions co-extensive with the location of *David's Fancy,*
the original, surveyed in 1671, he cannot be permitted to
give evidence to the jury to extend his pretensions beyond
the lines and limits which he has given to the tract of land
called *David's Fancy,* under the escheat grant to *John
Moale* in 1738, but is estopped by that location from going
beyond the black letter V, from whence he must run to the

head of *Howard's* Branch, at whatever point the jury may find the same to be agreeably to the plaintiff's location of his pretensions, and the location by which the defendant has taken defence.

The court are further of opinion, that the plaintiff shall not be permitted to give any evidence of the two first lines of *David's Fancy*, surveyed for *John Moule* the 1st of November 1738, running otherwise than as they are located from the black letter A on the plots, with the black broken and dotted lines No. 1 and No. 2, to the black letter b, as the location of his pretensions; but that the plaintiff is not precluded from giving evidence of any other lines as the two first lines of *David's Fancy*, the original, by way of illustration; and that the plaintiff may support the location of his pretensions, so far as he can show that the same are located within the limits of the original tract of land called *David's Fancy*.

4. The Plaintiff then prayed the opinion of the court, and their direction to the jury, that from the place where the jury find the termination of the second line of *David's Fancy*, the original, the third line thereof must run the number of perches expressed in the grant, and cannot, in its length, be increased or diminished, unless proof is made of the tree called for, or the place where it stood.

DONE, J. The court direct the jury according to the plaintiff's prayer.

5. The plaintiff then prayed the opinion of the court, and their direction to the jury, that from the place where the jury find the termination of the third line of *David's Fancy*, the original, they are competent to run the fourth line thereof to the head of the branch called for at the letter *r*, the gum tree, or at black letter F, or at any point between; and that the plaintiff is competent to recover so far as his pretensions are included within the lines of *David's Fancy*, the original, as found by the jury.

DONE, J. The Court do not think the last prayer is embraced within the decision of the court already given.

The Court are of opinion, that the fourth line of *David's Fancy*, the original, must run from the place where the jury shall find the termination of the third line, a straight

268

line to the head of the branch. That the course in the certificate, and the course located, is but one line.

6. *The third bill of exceptions.* The defendant produced and swore *Zachariah Maccubbin,* as a witness to the jury, to prove, and who did prove, that *Richard Moale,* under whom the lessors of the plaintiff make title, and *John Eager Howard,* the defendant in this cause, employed *Maccubbin* to run the tract of land called *David's Fancy,* that they both attended at times during the survey, and that on said running, the fourth line of the land was run course and distance, by and with the leased lands of *Moale,* to a point on *Howard's* Branch, to or near a gum tree located on the present plots returned in this cause at the little letter $r$, at the instance of *Moale,* in order to show the true location of that line. The plaintiff then produced to *Maccubbin* a plot of the land called *David's Fancy,* and proved by him that the said plot was the one which he made out for *Moale,* on the running so made; that the same now produced was the original plot, by the witness made out for, and at the instance of *Moale.* He further proved, that the lines on this plot are actually located on the plots in this cause made; and further proved by *Maccubbin,* that after the same running he also made out a plot for the defendant. He then offered to read in evidence the plot so made out by *Maccubbin* for *Moale.* The defendant further proved by *Maccubbin,* that the corrected lines on the plot were never run on the ground, and that the plot was made out after the survey, at the instance and direction of *Moale,* and that the corrected lines of the plot were drawn upon the plot at the sole direction of *Moale,* without the knowledge, and in the absence of the defendant. *Maccubbin* further proved, that he has no recollection whether he did or did not run any of the lines of *Upton Court,* which are laid down on the plot, and that the whole plot, and all the explanations, were made in the office of *Maccubbin,* in the absence of the defendant; and that *Moale,* during the time he was employed in making the plot and explanations, frequently was present, and gave him directions about the work. *Maccubbin* further proved, that the four lines terminating at black letter C, were never run on the ground, and that those lines never were laid down on the plot by the direction or with the knowledge of the defendant, or in his presence; but that the

1808.

Howard
vs
Moale

1808.

Howard
v.
Moale

waters and branches, designated on the plot, were made by actual survey. The defendant then objected to the reading the plot and explanations to the jury.

*Shaaff*, for the Defendant, cited *Jarrett vs. West*, 1 *Harr. & Johns.* 501.

Done, J. The court are of opinion, that as evidence has been given by the defendant of the runnings of the land, it is proper that the plot should go to the jury, for them to judge of the effect of it in the present question.

The court do not say whether it would have been evidence originally had it been offered, but as the defendant had offered evidence by the witness, who made the survey, to show *Richard Moale* did not claim, it is proper the plot should go to the jury.

The court are therefore of opinion, that the plot and explanations are admissible evidence in the cause, and they are permitted to be given in evidence to the jury. They were accordingly given in evidence to the jury. The defendant excepted.

7. The defendant then prayed the opinion of the court, and their direction to the jury. That the *twelfth line* of *Upton Court* must run as nearly as possible according to the course and distance thereof, as expressed in the original certificate and patent of that tract, so as to strike the branch called for at the end of that line.

Done, J. The Court are of opinion, and so direct the jury, that the course and distance in a certificate or grant must always be controled by a call expressed in the same, and that in this case the course and distance must be complied with, as nearly as they can, to strike the branch described to be at the end of the twelfth line of the tract of land called *Upton Court*, as the jury may believe the said branch to have existed at the time of the survey of the said land; subject also to the opinion of the jury as to the variation of the compass on the said line.

8. *The fourth bill of exceptions.* The plaintiff then read in evidence, the certificate of a tract of land called *Oliver's Range*, made on the 26th of January 1722-3, for *Thomas Cromwell*, in virtue of a special warrant of resurvey to him granted, to resurvey the tract called *David's Fancy*, grant-

ed to *David Williams* on the 1st of May 1672, for 100 acres; whereby was resurveyed for *Cromwell*, the said land, with contiguous vacancy added, &c, "lying on the N side of *Patapsco* river, and on the W side of the Middle Branch, beginning at a bounded locust stump standing near the said branch, said stump being a boundary of a parcel of land called *Upton Court*, and running thence with said land E 65 perches, still with said land N E 250 perches, to the N W branch, then N N W 86 perches, thence S W by W 70 perches, thence W N W 34 perches, to a bounded white oak of *John Howard's* land, called *Timber Neck*, standing in a small fork descending into the head of *Howard's* Branch, thence with the said land S W by W 34 perches, to the head of *Howard's* branch, thence bounding on the said branch S by W 70 perches, still with said branch S 27° W 60 perches, still with said branch S 56° W 70 perches, still with said branch S 50° W 60 perches to the Middle Branch, thence, S 20° E 30 perches, thence with a straight line to the said locust stump, containing 183 acres of land more or less," &c. He also offered evidence of ancient runnings of the tract called *Upton Court*, by which the *fourteenth* line thereof was run and extended to the N W branch of *Patapsco* river, and that no land has ever been taken up southward of the black letter *b*, and below the red letter L, except what has been held and possessed under the tract called *Upton Court*, or the land called *David's Fancy*. The defendant then prayed the opinion of the court, and their direction to the jury, that the *second line* of *David's Fancy* surveyed for *David Williams* on the 22d of June 1671, must be terminated at the end of the 150 perches from the beginning, from whence the *third line* of that tract must run according to its course and distance, as expressed in the original certificate and patent thereof, and the *fourth line* from the end of the third line, to the head of *Howard's* branch.

*Harper*, for the Defendant, cited *Thompson et al. Lessee vs. Brown*, 1 *Harr. & Johns.* 335. *Dallas vs. Stansbury*, (in the General Court May 1801,) *Hammond vs. Ashton*, (*Ibid* May 1797.) *Owings vs. Kelly*, (*Ibid* May 1796.) *Hellen vs. Garretson*, (*Ibid* October 1797.)

*Key*, contra, cited *Helm's Lessee vs. Howard.*

DONE, J. This court are bound by the decision in *Dorsey's Lessee vs. Hammond*, which must govern in deciding upon the prayer now submitted. The court are of opinion, that the termination of the second line of *David's Fancy*, surveyed for *David Williams* on the 22d of June 1671, is a matter of fact to be left to the determination of the jury, on the evidence given to them in the cause. The court therefore refuse to give the opinion and direction prayed for by the defendant's counsel. The defendant excepted.

9. *The fifth bill of exceptions.* The plaintiff then gave in evidence, that the *twelfth* line of *Upton Court* terminated at the letter black A, on the plots; that the original tract of land in 1672, called *David's Fancy*, began at the letter black A; that the certificate of *Oliver's Range* began at the letter black A; and that the escheat land called *David's Fancy*, in 1750, granted to *Richard Moale*, began at the letter black A. And further gave evidence to the jury, that the land on each side of the two lines proceeding from the letter black A on the plots, and running down to the N W branch of *Patapsco* river, has been always held, claimed and considered, as *Upton Court* and *David's Fancy*, and that ancient runnings of the said two lines, being the *thirteenth* and *fourteenth* lines of *Upton Court*, were from the letter black A, down to the N W branch of *Patapsco* river. He then read the opinion of the court, and their direction to the jury, contained in the *second* bill of exceptions in this cause. And gave in evidence the admissions of the defendant, and the opinion of the court, that if the tree at the end of the *third line* of *David's Fancy*, the original, therein called for, was lost, and no evidence of where it stood was given, then the third line must be run its number of perches, which number could not be lessened or increased, from the place where the jury should find the true termination of the second line. He also gave in evidence the opinion of the court given on the prayer of the defendant, No. 3. He further gave in evidence, that the true location of the *thirteenth* and *fourteenth* lines of *Upton Court*, and the *first* and *second* lines of *David's Fancy*, the original, are truly located on the plots from letter black A, with the inner black lines 1 and 2, to little black *a*, by the side of the N W branch of *Patapsco* ri-

1808.

Howard
vs
Moale

ver. The defendant then prayed the opinion of the court, and their direction to the jury, that if they are of opinion from the evidence, that the original beginning tree of *David's Fancy*, surveyed for *John Moale* on the 1st of November 1738, is proved at the black letter A upon the plots, and that the *first* line of the land, as run by the surveyor, and expressed in the certificate and patent thereon issued, was run as described on the plots by the black broken line numbered with the black figure 1; and that the *second* line of the land, as expressed in the certificate and patent thereof, and run by the surveyor, run to the N W branch of *Patapsco* river, at the black letter b on the plots; and that the *third* line of the land, as described in the certificate and patent run by the surveyor, run *to* the black letter V on the plots; and that the *fourth* line of the land as run by the surveyor, and described by the certificate and patent thereon, run to the head of *Howard's* Branch, at the black letter i, and from thence with the meanders of *Howard's* Branch, and to the beginning, that then the certificate, and the patent thereon issued, do not in law operate to pass any land which may be included within the original grant of *David's Fancy*, surveyed for *David Williams* on the 22d of June 1671, except the same may be also included within the metes and bounds of *David's Fancy*, surveyed on the 1st of November 1738, as above described; and that *David's Fancy*, surveyed the 1st of November 1738, does not, by legal operation, convey all the land contained within the original certificate and patent of *David's Fancy*, surveyed on the 22d of June 1671, unless the particular metes and bounds of *David's Fancy*, surveyed the 1st of November 1738, shall also include the same.

Done, J. This point has been decided by this court in *Gittings Jun's. Lessee vs. Hall.* The court therefore refuse to give the opinion and direction prayed for by the defendant's counsel. The defendant excepted.

10. *The sixth bill of exceptions.* The plaintiff offered to read the deposition of *Windel Lawrence*, taken under the survey made in this cause. The plaintiff having proved by *Anne Lawrence*, a witness sworn in court, that her husband, *Windel Lawrence*, went on board the *Norfolk* packet, captain *Deagle*, to go to *Norfolk*, about three

weeks ago *(a.)* He first said that he intended to go to *Alexandria*, but the morning he left *Baltimore*, he informed the witness he would go to *Norfolk*. That when he departed, he said he should stay till the fall. That the witness hath not seen or heard from him since, and that he informed the witness, that if it suited him, he should remove his family there. That he is a brick-maker by trade. That the witness and his family, consisting of five children at this time, live in *Baltimore*. The plaintiff also proved by another witness, *John F. Holland*, that about the 15th of May 1804, he settled with *Windel Lawrence*, when he informed the witness that he owed some money; that he must go away if the witness did not supply him. The witness told him that he would, but that he lost so much time by attending as a witness at *Annapolis*, that he could not advance him any further sum. That *Lawrence* left the employ of the witness on the 16th of May 1804, and hath not returned since. That *Lawrence* had been in his brother's employ for 2 or 3 years previous. That it is the general reputation of the neighbourhood, that he has left the state, and gone to *Norfolk*, to work at the brick-making business. The plaintiff also proved by another witness, *Joseph Robinson*, that he the witness is acquainted with *Lawrence*, that he informed the witness, at first, that he intended to go to *Alexandria*, but afterwards told him that he was going to *Norfolk*, to work at his trade. That this conversation happened sometime about the early part of May 1804, and that he the witness hath not seen him since. That he left the employment of *Holland* and *Ensor*, in *Baltimore*, where the witness worked with him. The defendant objected to the reading of the deposition in evidence to the jury.

Done, J. The court are of opinion, that the deposition of *Windel Lawrence* is competent and legal evidence to be read to the jury.

This is different from the case of *Darnall's Lessee vs. Goodwin*. There, the deposition was not in the same suit, nor had the witness been in the state for a length of time. Here, every means has been used to obtain the attendance of the witness, and it is in proof that he is out of the reach of the process of the court. The defendant excepted.

*(a)* The trial commenced on the 5th of June 1804.

11. *The seventh bill of exceptions.* The plaintiff then prayed the opinion of the court, and their direction to the jury, that although *David's Fancy*, the original, is located by the plaintiff from A on the plots, with an allowance for variation amounting to six degrees and an half of a degree; and though *David's Fancy*, the escheat patent, is located from the same place, with an allowance of three degrees and one quarter of a degree for variation, the jury are not bound by the variation thus allowed, but may find the true location to be by a greater or less variation, as shall appear to them proper from the evidence in the cause.

*Martin,* (Attorney General,) for the Plaintiff, cited *Esp.* 490.

*Shaaff* and *Harper,* contra, cited *Hammond vs. Norris,* (*ante* 130.)

Done, J. The court are of opinion, and so direct the jury, that they may, agreeably to the evidence given in this cause, find the true location of *David's Fancy,* under the escheat patent, by a greater or less variation of the compass, as shall appear to them proper from the evidence; provided that by such allowance of variation they are not to enlarge or extend the pretensions of the plaintiff beyond the location of his pretensions made on the plots, or beyond a straight line to be drawn from the letter V to the head of *Howard's* Branch, wherever the jury shall find the same to be. The plaintiff excepted.

12. *The eighth bill of exceptions.* The court having given their opinion and direction to the jury, in the *seventh* bill of exceptions, that the plaintiff had made title to the land called *David's Fancy,* according to the locations thereof, under and in virtue of the certificates and patents, and the court having determined that the jury might, agreeably to the evidence given, find the true location of *David's Fancy,* under the escheat patent, by a greater or less variation, as should appear to them proper from the evidence; provided that by such allowance of variation they were not to enlarge or extend the pretensions of the plaintiff beyond the location of his pretensions made on the plots, or beyond a straight line to be drawn from the letter V to the head of *Howard's* Branch, wherever the jury should find the same to be; the plaintiff prayed the opini-

on and direction of the court to the jury, that if the jury are of opinion, from the whole of the evidence, that the true location of the original tract called *David's Fancy*, and the escheat tract also called *David's Fancy*, runs from black A, with the inner black lines No. 1 and No. 2, to black *a*, by the side of the N W branch of *Patapsco* river, and from thence to black figure 3, on the plots, and from the figure 3 to such point or place as they may find from the evidence to be the head of *Howard's* Branch, that then the plaintiff is entitled to recover the whole of his pretensions located on the plots, which shall lay within the location found by the jury, and is not obliged to abandon any part of his actual located pretensions, by drawing a straight line from V to such place as the jury shall establish to be the head of *Howard's* Branch.

Done, J. The court are of opinion, that the plaintiff cannot recover any land in this action which shall be found to lie without and beyond a straight line to be drawn from the letter V to the head of *Howard's* Branch, wherever the jury shall find the head of that branch to be, although those lands shall lie within the lines of *David's Fancy*, according to the true location, as so found by the jury, and also within the lines of the plaintiff's pretensions, as at present located upon the plots. The plaintiff excepted.

13. *The ninth bill of exceptions.* The plaintiff then prayed the opinion of the court, and their direction to the jury, that if he is *estopped* from showing the true location of *David's Fancy*, the escheat, different from what is located by him for his pretensions, so as to prevent him from recovering what is contained in his pretensions within the true location, the defendant is also *estopped* from saying that the true location is different from the location given by the plaintiff.

*Martin*, (Attorney General,) and *Key*, for the Plaintiff, cited *Com. Dig.* tit. *Estoppel*, (B) (C.) *Brereton vs. Evans*, *Cro. Eliz.* 700. *Ludford vs. Barber*, 1 *T. R* 86. *Co. Litt.* 352, a. *Gray et ux. Lessee vs. Amos*, (October 1796.)

Done, J. The court are of opinion that the doctrine of estoppel does not apply to the present question It is doubtful whether estoppel can be brought at all into view

in the case.   The court refuse to grant the prayer.   The plaintiff excepted.

The jury returned the following verdict:  The jury find the true location of *David's Fancy*, the original, and *David's Fancy*, the escheat, to be from the beginning at black *A*, as described upon the plots in this cause returned, then with the inner black lines 1 and 2, to little black *a*, on the north west branch of *Patapsco* river, and from the said *a*, the jury find the third line to run to figure black 3, and from thence the jury find the fourth line runs to four perches below big black *F*, which the jury find the head of *Howard's* Branch, and from thence, with *Howard's* Branch and the *Middle* Branch, binding on the same, to the beginning at *A*; and the jury find for the plaintiff his pretensions from the said *A*, with lines 1 and 2, to *a*, and from thence to *V*, and from *V* to four perches below big *F*, which the jury find the head of *Howard's* Branch, and with the same, binding on the branches to the beginning; and that the defendant is guilty of the trespass and ejectment complained of in the declaration, within the said pretensions, in the manner complained of by the plaintiff.  And as to the residue of the trespass and ejectment complained of in the residue of the tract of land called *David's Fancy*, for which the defendant hath taken defence upon the plots returned in this cause, the jury find the defendant is in no wise guilty thereof.   Judgment—That the plaintiff recover against the defendant his *several terms* aforesaid yet to come and unexpired, of and in all that part of the said tract of land called *David's Fancy*, in the declaration mentioned, lying, &c. which is contained within the description and finding of the jury, that is to say, beginning at black *A*, upon the said plots in this cause returned, and running with the inner black lines 1 and 2 to little black *a*, on the north-west branch of *Patapsco* river, and from thence to *V*, and from *V* to four perches below big *F*, the head of *Howard's* Branch, and with the same, binding on *Howard's* Branch and the *Middle* branch, to the beginning—and also for costs.   As to the residue, &c. judgment for the defendant. The defendant appealed to this court.

The cause was argued at the last term before TILGHMAN, BUCHANAN, NICHOLSON, and GANTT, J. on the *first, second, third, fourth, fifth,* and *sixth* bills of exceptions, taken by the defendant below.

1808

Howard
vs
Moale

*Harper, Shaaff* and *Taney,* for the Appellant, stated, that the *first* bill of exceptions embraced three points—. 1. Whether the Lord Proprietary be not *estopped* by his grant of *Lun's Lot* as to all such parts of *David's Fancy,* (the original.) as are included within the true location of *Lun's Lot?* 2. Whether the entail created by the patent of *David's Fancy,* (the escheat.) be docked by the deed of bargain and sale to *Croxall?* 3. Whether, admitting these two points to be determined in favour of the plaintiff below, any estate in the escheat land passed to the lessors of the plaintiff by the will of *John Moale,* it not appearing that *John Moale* entered or died seized?

On the *first* point they cited *Kelly's Lessee vs. Greenfield,* 2 *Harr. & M'Hen.* 121. *Russell's Lessee vs. Baker,* 1 *Harr. & Johns.* 71. 2 *Blk. Com.* 295. *Co. Litt.* 47, b, 352, a. 10 *Vin. Ab.* 471, 482, 485. *Fairtitle vs. Gilbert,* 2 *T. R.* 171. *Hayne vs. Maltby,* 3 *T. R.* 441. 4 *Com. Dig.* tit. *Estoppel,* 80, 84. 10 *Vin. Ab* tit. *Estoppel,* (B. a.) *Co. Litt.* 47, a, 363, b, 366, b; and *The Attorney General vs. Anderson,* 1 *Harr. & M'Hen.* 219.

On the *third* point they cited 5 *Bac. Ab.* tit. *Verdict,* (D.) *Mahoney vs. Ashton,* 1 *Harr. & M'Hen.* 210. *Stat.* 32 *Hen.* VIII, *ch.* 1. 5 *Bac. Ab.* tit. *Wills and Testaments,* (D. 1.) *Stat.* 34 *Hen.* VIII, *ch.* 5, s 3, 5. *Wallis vs. Fletcher, Cro. Eliz.* 530. *Ingram vs. Tothill,* 1 *Mod.* 217. *Bunter vs. Coke,* 1 *Salk.* 238. 2 *Bac. Ab.* tit. *Legacies and Devises,* (B) 51, 52. 2 *Blk. Com.* 310, 209, 227, 228, 312, 328, 332, 338, 375; and 2 *Bac. Ab.* tit *Descents,* (C) 30.

That on the *second* bill of exceptions two questions arise —1. Whether the escheat patent does, by operation of law, relate to the original patent? 2. Whether the expressions used in the original patent of *David's Fancy* do, by operation of law, bind its *second line* on the *fourteenth line* of *Upton Court?*

As to the *first* question, they cited *The Attorney General vs. Snowden,* 1 *Harr. & Johns.* 332. *Ratcliffe's* case 3 *Coke,* 40. *Kelly's Lessee vs. Greenfield,* 2 *Harr. & M'Hen.* 2 *Blk. Com.* 244. *The Attorney General vs. Anderson,* 1 *Harr. & M'Hen.* 219; and *Litt. Sect.* 348.

As to the *second* question, they cited *Helm's Lessee vs. Howard,* 2 *Harr. & M'Hen.* 57. *Dorsey's Lessee vs. Hammond,* 1 *Harr. & Johns.* 190; and *Davis's Lessee vs. Baly, Ibid* 264.

1808

Howard
vs
Moale

That on the *third* bill of exceptions, the question was, whether a plot in which the defendant below had nothing to do, of the making of which he was ignorant, and which was made for and under the direction of *R. Moale*, under whom the lessors of the plaintiff claim, could be given in evidence against the defendant, merely because it was in part founded on a survey made at his instance and that of *R. Moale?* They cited *Anonymous*, 1 *Stra.* 95. *Bull. N. P.* 247, 248; and *Bridgman vs. Jennings*, 1 *Ld. Raym.* 734.

That on the *fourth* bill of exceptions two questions arise—1. Whether the termination of the *second line* of *David's Fancy*, (the original,) be not a question of *law* for the decision of the court? 2. Whether the true legal construction of the patent of *David's Fancy*, (the original,) be not to terminate its *second line* at the end of 150 perches?

On the *first* of these questions they cited *Gibson's Lessee vs Smith*, 1 *Harr. & Johns.* 253. *Gittings's Lessee vs Hall*, (on appeal in this court.). *Dorsey's Lessee vs. Hammond.* 1 *Harr. & Johns.* 190.

On the *second*, *Gittings's Lessee vs. Hall*, (on appeal in this court.)

That on the *fifth* bill of exceptions, the question was, whether the location of the escheat patent of *David's Fancy* be not independent of the location of the original, except so far as the lines of the former expressly call to bind on those of the latter? They cited *Helm's Lessee vs. Howard*, 2 *Harr. & M'Hen* 57. *Dorsey's Lessee vs. Hammond*, 1 *Harr. & Johns.* 190. *Howard's Lessee vs. Cromwell*, *Ibid* 118; *and Hawkins vs. Hanson*, 1 *Harr. & M'Hen.* 523.

That on the *sixth* bill of exceptions two questions arise, 1. Whether a deposition taken on the survey could be read in evidence, unless it appeared that the witness was dead, or removed to a foreign country? *Whether a mere temporary* absence be sufficient? 2. Whether in this case the plaintiff below be not precluded by his neglect from the benefit of this testimony? They cited *Darnall's Lessee vs. Goodwin*, 1 *Harr. & Johns.* 282; and 1 *Lofft's Gilb,* 60.

That three questions arise upon the record, independent of and unconnected with the bills of exceptions—1. That the death of one of the lessors of the plaintiff, since the action was brought, and suggested after the jury were sworn,

makes the proceedings erroneous. 2. That the finding of the jury is uncertain; and 3. That the judgment is entered to recover all the several terms stated in the declaration, including the term on the demise of the lessor, whose death was suggested.

In arguing the *first* and *third* questions they cited *Howard's Lessee vs. Gardiner*, 3 *Harr. & M·Hen.* 98. The acts of 1785, *ch.* 80, and 1801, *ch.* 74, *s.* 38. *Com. Dig.* tit. *Abatement. Aslin vs. Parkin*, 2 *Burr.* 667, 668. *Parker vs. Harris*, 1 *Salk.* 262. *Henriques vs. Dutch West India Company*, 2 *Stra.* 808. *Lampen vs. Hatch*, *Ibid* 934. *Frederick vs. Lookup*, 4 *Burr.* 2021; and *Cuming vs. Sibly*, *Ibid* 2490.

As to the *second* question they cited *Bac. Ab.* tit. *Verdict*, (Q.) and *Gittings's Lessee vs. Hall*, 1 *Harr. & Johns.* 14.

*Johnson*, (Attorney General,) *Key, Mason* and *Martin*, for the Appellee, on the *first* bill of exceptions cited, as to the *first* point, 1 *Pow. on Cont.* 152, 160. *Co. Litt.* 45, a, 47, b, 352, a, 363, b. 2 *Blk. Com.* 245, 346. 10 *Vin. Ab.* tit. *Estoppel*, 433, pl. 1; 461, pl. 3; 463, pl. 22, pl. 26; 475, pl. 4; 476, pl. 1. *Goodtitle vs. Morse*, 3 *T. R.* 365. 3 *Com. Dig.* 271; and *Pickett vs. Dowdall*, 2 *Wash. Rep.* 106. As to the *second* point, they cited *Calvert's Lessee vs. Eden*, 2 *Harr. & M Hen.* 279. And as to the *third* point they cited *Lux's Lessee vs. Pellett*, 1 *Harr. & Johns.* 83. (note.) *Taylor vs. Horde*, 1 *Burr.* 60. 16 *Vin. Ab.* tit. *Possession*, 455, pl. 1 *Smith vs. Stapleton*, 1 *Plowd.* 431. *Moore*, 214 *Deux vs. Jefferies*, *Cro. Eliz.* 352; and *Sacheverel vs. Bognott*, *Ibid* 356.

On the *second* bill of exceptions, they cited as to the *first* question, 2 *Blk. Com.* 244, 245. *Burgess vs. Wheate*, 1 *W. Blk. Rep.* 146. 163, 166. *Co. Litt.* 215, b; and *The State vs. Reed*, 4 *Harr. & M·Hen.* 6. And as to the *second* question they cited *Dorsey's Lessee vs. Hammond*, and *Gibson's Lessee vs. Smith*.

On the *fourth* bill of exceptions they cited *Dorsey's Lessee vs. Hammond*.

On the *fifth* bill of exceptions they cited *Gittings's Lessee vs. Hall*, 1 *Harr. & Johns.* 14. *Tolson's Lessee vs. Lanham*, (ante 174;) and *Gittings's Lessee vs. Hall*, (on appeal in this court)

On the *sixth* bill of exceptions they referred to the acts of July 1721, *ch.* 14, and July 1779, *ch.* 8.   *Stevenson vs. Mayers,* 1 *Harr.* & *Johns.* 102.   *Gilb. L. E.* 60.   1 *Lofft's Gilb.* 214. 218; and *Fry vs. Wood,* 1 *Atk.* 445.

On the alleged errors in the record they cited, on the *first* and *third* points raised, *Far vs. Denn,* 1 *Burr.* 362, 363, 364.   *Oates vs. Brydon,* 3 *Burr.* 1897.   *Runn. Eject.* 411, 413, 414, 438, 459.   *Addison vs. Oatway,* 1 *Mod.* 252.   *Anon.* 1 *Salk.* 260.   *Bull. N. P.* 98.   *Thrustout vs. Grey,* 2 *Stra.* 1056.   *Fairclaim vs. Shamtitle,* 3 *Burr.* 1290.   *Aslin vs. Parkin,* 2 *Burr* 667.   1 *Bac. Ab.* tit. *Abatement,* (F.)   And as to the *second* point they cited *Cottingham vs. King,* 1 *Burr.* 628, 629, 630.   *Carroll et al. Lessee vs. Norwood,* 1 *Harr.* & *Johns.* 186.   *Darnall's Lessee vs. Goodwin, Ibid* 284.   *Sullivane vs. Seagrave,* 1 *Stra.* 695.   *Camell vs. Clavering,* 2 *Ld. Raym.* 789.   *Bindover vs. Sindercombe, Ib.* 1470   2 *Bac. Ab.* 230, 231, 232; and *Whittingham vs. Andrews,* 1 *Salk.* 255.

*Curia adv. vult.*

THE COURT, (at this term,) concurred in the opinions of the General Court, as contained in the several bills of exceptions taken on the part of the defendant in that court, and were of opinion, that there was no error either in the judgment or in the record of proceedings.

NICHOLSON, J. I am for affirming the judgment upon all the bills of exceptions; also upon the alleged uncertainty of the verdict and judgment; also for the alleged error as to the death of *Richard H. Moale.* I am decidedly of opinion, that the death of the plaintiff's lessor does not abate a suit in ejectment. In affirming the judgment of the general court, upon the *first* bill of exceptions, I wish it to be understood that I do not entertain the most remote idea, that the Lord Proprietary was not liable to be es-. topped. as other individuals are, or that he had any other of the *incidental* prerogatives of the Kings of *England;* he had only such of the *direct* prerogatives as were expressly granted by the charter.

JUDGMENT AFFIRMED.